Zimmerman, J.
Tbis is a proceeding to contest a special election held in the City of Washington, Fayette county, Ohio, on March 30, 1905, under what is known as the Beal Municipal Local Option Law, and is in the court on petition of George Jackson, J. W. Willis, H. B. Brownell and J. C. Dunn, plaintiffs, against the City of Washington, defendant, filed April 8, 1905.
*454 And thereupon the defendant, the City of Washington, filed a motion, duly verified, to certify the matters and proceedings involved in said petition to the court of Common Pleas of Fayette County, Ohio, alleging therein several grounds to the effect that this court was prejudiced and biased against the contestees.
The petition was filed in this court under an act commonly known as the Beal Law (95 O. L., page 87). Section 4364-20Í of this act provides that the contest of elections held under this law shall be by petition filed in the probate court.
Therefore it appears that the probate court is the only court having jurisdiction in this matter, and to have allowed the motion to prevail would have deprived these petitioners of the right of contest.
The defendant made application to make certain parties defendant w'hoi are engaged in the retail liquor business in this city, alleging that their interests are affected by these proceedings.
The Beal Law (95 0. L., 87) direct that the probate judge upon the filing of the petition shall forthwith issue a summons, addressed to the mayor of the city, notifying him of the filing of such petition, and it is not the intent and spirit of this act to make any other parties defendant. The application was not allowed.
The plaintiffs in their petition claim:
‘ ‘ That in accordance with the order made by said council of sajd city, an alleged and pretended election was held on the 30th day of March, 1905, in said City of Washington, under said laws of Ohio, to determine by ballot, whether the sale of intoxicating liquors as a beverage should be prohibited within the limits of said municipal corporation; that the allegied result of said election as certified by the judges and clerics thereof, and by the said clerk of said council, was: Whole number of votes for the sale of intoxicating liquors as a beverage, 857; whole number of votes against the sale of intoxicating liquors as a beverage, 809; giving a majority of 48 upon the returns of said judges and clerks of said election in favor of the sale of intoxicating liquors as a beverage. ’ ’
The petitioners state:
‘ ‘ That at the time of such election and for more than 'a year prior thereto, there was published in said city of Washington, *455 two newspapers of opposite polities, of general circulation in said city, there being a Democratic paper know as the Ohio State Register, and three Republican papers published in said city, all of which papers were of general circulation in said city among members of the respective political parties; that said mayor of said city caused the proclamation and notice of said election to be published in one Republican newspaper published in said city and in no other paper published in said city.”
The defendant demurred and also moved that the same be stricken out.
The object and intent of the Legislature in requiring that publication be made in two papers of opposite politics in such cases is that all the electors of such a municipality may be given due notice of the pending election; and all may have the right to exercise a ballot for or against such a proposition; and such a right should be protected so that all the electors may be made aware of the questions that are to affect their rights and privileges.
It was shown by the poll books and tally sheets that there were 44 more votes cast at .the election held on the 30th day of March, 1905, than were cast in this city at the Presidential election of 1904, and as .all the electors of this city must, therefore have had knowledge of the election, the object and purpose of the law was fulfilled, and the demurrer was sustained. (Citing 15 Ohio State, 532; 4 C. C.—N. S., 81).
It is further claimed by the contestors:
“That there were cast at said election 1666 votes; that this number of votes certified by the judges and clerks of said election and the clerk of the council of said city, including one hundred and more votes east by persons who were not qualified electors of the City of Washington on the day of said election, and that said persons in easting said votes, were not legal and qualified electors of said city on said day, yet voted for the sale of intoxicating liquors as a beverage, and that their said votes were counted by the judges and clerks of said election, and certified as aforesaid; that had it not been for the easting of said illegal votes by said persons, who were not qualified electors of said city, and the counting and certifying of the same, that the majority of legal votes cast and certified as a result of said election would have been against the sale of intoxicating liquors as a beverage in said city. ’ ’
*456 To all of which, the defendant demurred and also- moved that the same be stricken out. The demurrer was overruled and the motion to strike otut denied.
The plaintiffs further claim in their petition:
“That of the 857 votes cast at said election for the sale of intoxicating liquors as a beverage in said City of Washington, and certified as aforesaid, a large portion thereof, being more than one hundred in number, were cast by electors and persons in said city who were then and there induced to, and did vote for the sale of intoxicating liquors, by means of bribery practiced by certain other electors in said city, who then and there, in order to procure a majority of the votes east at such election to appear in favor of the sale of intoxicating liquors, hired, employed, promised money and other reward, and paid money to said one hundred and more voters, and to each of them, and said voters and each of them then and there received said hire, employment, promise of money and other reward, .and. on account thereof, did then and there severally vote in favor of the sale of intoxicating liquors as a beverage at such election; and that because of said bribery, and said fraudulent, illegal and corrupting influences .aforesaid, of procuring said votes to be cast as aforesaid, and the casting of the same in manner and form aforesaid, and the counting of said illegal'votes by said counted in favor of the sale of intoxicating liquors as a beverage, whereas, had it not been for said bribery, and said fraudulent means in procuring said voters to cast their votes in manner and form aforesaid,and the counting of said illegal votes by said judges and clerks, the votes so certified against the sale of intoxicating liquors as a beverage in said city would have exceeded those certified as in favor of said sale of intoxicating liquors by more than one hundred votes. ’ ’
The defendant demurred to this clause of plaintiff’s petition, and also moved the court to strike out the same. The demurrer was overruled and the motion denied
The plaintiffs also further claimed:
“That a large number of electors in said city, the names of many of whom are unknown to the plaintiffs, and many of whom were interested in the saloon business carried on in said city, prior to and upon the day of said election, combined together and formed an organization for the purposes of corrupting, bribing and influencing votes of other electors of said city, and for the purpose of procuring persons who were not qualified *457 electors of said city to vote at such election, and for the purpose of preventing a fair and honest election upon the question of the sale or the prohibition thereof of intoxicating liquors in said city as a beverage, and for the purpose, by such corrupt, fraudulent and unlawful methods, of onalmg it appear that a majority of the votes cast at such election were for the sale of intoxicating liquors as a beverage in said city, did then and there and thereby at such time and for such purposes, procure a large number of persons, the exact number of whom are unknown to plaintiffs, who were not qualified electors <of said city to vote at such election in favor of the sale of intoxicating liquors as a beverage, in said city; and did them .and there and thereby, for such purposes by means of bribery, hire, employment, and the giving of money to voters to influence their votes', induce and procure a large number of electors in said city, the exact number of whom are unknown to plaintiffs, to cast their votes in favor of the sale of intoxicating liquors as a beverage in said city; and that by reason of all the premises aforesaid, a large number of persons, who were not qualified electors in said city, did -then and there at such election, vote in favor of the sale of intoxicating liquors as a beverage dh said city, because of the bribery, hire, employment, payment of money and corrupting influences aforesaid, and were thereby induced to and did at such election, accept said bribes, hire, employment and payment of money, and on account thereof did vote for the sale of intoxicating liquors as a beverage in said city; that the exact number of persons so illegally voting as aforesaid is unknown to these petitioners, hut plaintiffs aver that if it' had not been for the procuring of said illegal votes to' he east in the manner and form aforesaid, there would have voted against the sale of intoxicating liquors as a beverage in said city, a number thereof sufficient to make -a majority at such election against the sale of such liquors as aforesaid; that the. majority of votes cast at such election would have been in favor of the prohibition of the sale of intoxicating liquors as a beverage in said city; that said combination of electors .aforesaid -to further corrupt and ctefeat the will of the voters at such election, procured a device to be used by the voters consisting of a blank ballot and a sheet of carbon paper of the same size and form of. said ballot, which was inserted in an envelope and sealed up and said envelope was so marked as to enable the electors to use the same in connection with the marking of the official ballot in the election booth, in such manner that he could convey the information as to how he voted, by re-. turning said envelope, blank ballot and carbon to the party from whom he had received the same, showing by said blank ballot that, *458 he voted in favor of the sale of intoxicating liquors as a beverage.
“Said device so above described, was at such election delivered to and used by a great number of the electors so voting at said election, to-wit, more than -two hundred thereof, and that said electors so using said device were each to and did receive a money consideration for their votes so cast, upon the return of said device to the aforesaid combination of electors, which showed by the carbon mark upon said blank ballot that each of said votes were cast in favor of the sale of said intoxicating Liquors as a beverage in said city; that by reason of said fraudulent device so used by said combination of electors, the secrecy of the ballot was destroyed, the will of a majority of the legal voters was defeated, and said election thereby rendered fraudulent and' void. ’ ’
The defendant demurred to this, clause of the petition, and moved to strike out the same. The demurrer was overruled and motion denied.
The defendant then filed a general denial to the petition.
Many questions have arisen in the course of the trial, which consumed several weeks, and the calling of -many witnesses, and the court will pass upon the questions which, seem to be of the most importance.
Section 1, Article Y of the Constitution of Ohio provides that:
“Every white male citizen of the United States of the age of twenty-one years who shall have been a resident of the state one year next preceding the election, and of the county, township or ward in which he resides, such time as may be provided by law, shall 'have the qualifications of an elector, and be entitled to vote at all elections.”
The Legislature, by the power conferred upon it by the Constitution, enacted Section 2945, which provides that:
“No person shall be permitted to vote at any election unless he' shall have been a resident of the state fomone year;> resident of the county for thirty days and resident of the township, village or ward of a city or village for twenty days next preceding the election at which he offers to vote, except where he is the head of a family, and has resided in the state and in the county in which, said township, village or ward of a city or village is situate, the length of time required to entitle a person to vote under *459 the provisions of this title, and shall bona fide remove with his family from one ward to any other ward in such city or village, or from a ward of such city or village to a township or village in the same county, or from a township or village to a ward of a city or village, in the same county, or from one township to another in the same county; in such cases, such persons shall have the right to vote in such township, village or ward of a city or village, without having resided therein the length of time above described to entitle a person to vote; provided, that such voter so removing with his family from a township to a village or ward of city or village, in the same county, shall not have the right to vote at any municipal election, held in such city or village, unless he shall have resided therein twenty days prior to such municipal election. ’ ’
In the trial of this ease, the testimony disclosed the fact that voters who lived in one ward voted in another than the- ward in which they lived; others Who lived in the township and voted in the township at previous elections, moved -in the city a few days prior to the election—'less than twenty days —voted in the election held in this city, and immediately following said election, moved back to their former homes in the township.
In the case of the voter who lived in one ward and voted in, another ward than the one in which he resided, the eontestors claim is an illegal vote; on the other hand the contesitee claims as this election was submitted to the -electors on a proposition, it was not such an election as an election for candidates for office, but one of general effect, and that the electors of the city had a right to vote in any ward of the city, and were not confined to the wards in which they lived.
From the position taken by the oontestees it would not be nee: essary to have a city, on a proposition of this kind, divided into wards only for the purpose of the convenience of the voter. Under such a loose construction of the statutes, the door would be open for fraud of all kinds. A voter is much more likely to be acquainted with the electors of his own ward, than the electors of the entire city.
The strict construction of Section 2945, a® above cited, is that “no person shall be permitted to vote at any election- unless he shall have been a resident of the ward or city or village for twen *460 ty days next preceding tbe election at which he offers to vote; ’ ’ and before an elector can vote in a ward, he must be a resident of that ward at least twenty days preceding the election, except in eases where an elector is the head of a family, and moves in the ward in which he votes.
Those who live in. the township and move into the city less than twenty days preceding the election, and voted in the election are not residents of the ward, and are illegal voters. (R. S., Sec. 2945.)
Before a person can be a legal voter he must reside in the state one year, county thirty days, township twenty days, ward of a city twenty days, and twenty days within a village or precinct.
The evidence in this case disclosed the fact that many persons who voted here on March 30, 1905, had- heretofore been residents of this city, and had voted here in previous, elections and no questions were raised as to their residence. Afterwards many, of these voters moved with their families, household goods and effects from the city, previous to this election.
In moving they left no place of residence to return to in this city, vacating t'heir former homes, the same afterwards being occupied by others, leaving no household goods or effects of any kind here to indicate that they ever intended to return here again to live or to make this city their home.
The evidence further shows that ethers who had moved away from here with their families and effects, prior to the election of March 30, 1905, and who had voted at elections held elsewhere, in the meantime, returned to this city on the day of the election, or a few days before, without regaining their residence and voted here on March 30, 1905.
It was proven that others who voted here at the Beal Law election and were former residents of this city, had purchased homes in other cities, had moved there with their families and effects, and were living there on March 30,1905..
There was testimony tending to show that there were others who had lived here, some of whom were heads of families, and others unmarried, who were provided with money and transportation by parties who were in favor of the sale of intoxieat *461 ing liquors ito return here to vote at the Beal Law election held here on March 30, 1905.
The poll books and tally sheets were' used in evidence, showing names of voters appearing thereon who voted here, who were unknown and could not be found by subpoenas placed in the hands of the sheriff, who testified that he had made diligent search and inquiry, but was unable to find them, and his returns show, “not found.”
Several citizens of this city testified that they knew most of the voters of their respective wards, and that they had. made search, but were unable .to locate any place of residence in this city, by inquiry of others, or by means of their own' knowledge of various unknown parties who voted here on March 30, 1905.
The plaintiffs introduced testimony showing that names appearing on the poll books and tally sheets of the election of March 30, 1905, .of persons who voted here on that day, included names of minors, and introduced the birth records of the probate court and school records of this city, showing the age of such voiters; they also showed by said voters that they voted here on that day, and the records showed conclusively that the persons so voting were not twenty-one years, old when they voted on March 30, 1905.
The comtestee contended, and in several instances proved, that some of the numerous voters mentioned above were legal residents of this city and were away temporarily only, their intention being to return to this city, and that they had not abandoned their homes here.
It was claimed by plaintiffs that there were others who were unmarried, living outside of this city, but were residents of this county, who voted here, and that such voters had no legal residence in this city.
The eontestee contended that these p<ersons- were only away temporarily, and fhat their intentions were to return to this city to live, but they were unable to show that these voters bad any occupation or place of residence whatever in this city on March 30, 1905.
The question of residence is a very peculiar one, and one that must be determined by the acts and intentions of the party *462 himself; it can not be taken from inference, but must be determined solely from the facts.
The residence of a married man is governed by the place -of residence of his family, and the place where they reside must be his residence. The mere temporary absence of his family does not change 'his residence.
The law governing the residence -of an unmarried man is different, the latter having no family or home, except the home of his parents or his rooming or boarding place.
In the cases herein cited it was- shown that no such facts existed; these voters had n-o lodging place or boarding place in this city on the day -of the election, March- 30, 1905.
Considerable time of this trial was taken up by testimony showing that fraud 'and bribery had been committed by the parties who were in favor of the side of the proposition “for the sale of intoxicating liquors as a beverage. ’ ’ The testimony covered many different methods and means of procuring illegal votes in favor of the sale -of intoxicating liquors.
The contestors claim that on the day of the election, beginning early in the morning and continuing most of the -day, the parties favoring the sale of intoxicating liquors- were using closed cabs for the purpose of taking the voters to the voting precincts, and in said cabs, with drawn curtains, protected from the public gaze, then and there -did corrupt the- voter with the promise -of the payment of money to influence the -elector to- cast his vote for the sale -of intoxicating liquors as- a beverage.
The testimony tended to show that the occupants of these cabs were parties who were working on the side.-of the proposition “for the sale of intoxicating liquors as a beverage,” -and that these cabs were hired and paid for by the friends of that side. It was also claimed by the -contestors that the cabs were driven to the -election precinct, where they took in parties off of the streets and would take them a short drive, bring them back to the voting precinct and let them out to go in to vote. After voting the voter would get in the cab -again and be driven away.
The testimony -o-f witnesses who occupied the cabs showed that they had been given envelopes marked with an X mark with red *463 pencil on the lower left hand comer, and had been instructed that when they entered the booth they were to place the official ballot handed him by the election officer on the envelope and then make a cross on the ballot over the cross on the envelope. Marking the ballot in this way had the effect of -making a corresponding X mark on the carbon, ¡ballot enclosed in the envelope. The envelope was thereupon returned by the voter to the occupant of the cab, that the latter might determine whether or not the purchased vote had been cast as directed.
The voter was then given two- cards and a half card and directed to go to a certain place and there receive the sum of $2.50 for so voting.
It was also shown by the testimony that other voters were approached on 'the streets by certain panties and -asked to vote for the sale of intoxicating liquors, being assured that they w-o-uld receive for doing so the sum of $2.50, and it was shown that these voters were -directed to go to a certain place in an alley and drop the tickets into -a device similar to a slot, and there would roll down before them $2.50 in money.
The party cashing these cards was- concealed behind a screen and was not seen by the vote seller.
It was shown by one witness who- was working on the telephone cable above and near the Fourth ward poll that from his position he looked down over the curtain in the cab and could see the occupant of the cab pay money to many voters, and that a large roll of money was in evidence and in possession of the occupant of the cab, who- was shown to be working in the interest of the proposition “for the sale of intoxicating liquors as a beverage. ” -
The evidence shows that there were places to which voters were directed to go to arrange for voting -and to receive money after they had voted. These places were in upstairs rooms, stables and alleys. They attracted unusual attention and were repeatedly broken up by the parties who w-e-re -working ‘‘against the sale of intoxicating liquors -as a beverage. ’ ’
The testimony further discloses -the fact that certain officers of the election on March 30, 1905, took from certain voters while in the election booths nine sealed envelopes found in the hands *464 of said voters, who were ©aught using the envelopes in marking their official ballots. These envelopes were introduced in evidence and opened by the order of the court. They were found to contain carbon sheets and blank ballots, most of which were marked similarly to. the official ballots used on that day, indicating clearly by the position of the X mark how the elector had voted.
There was other testimony tending to show that other parties were approached and offered money to vote for the sale of intoxicating liquors by persons who were working in favor of thaj side. It was proved that two voters who voted on March 30, 1905, were inmates of the county infirmary and had been for some time, and that one of them admitted that he had received money for his vote. The eontestee contended that these parties were remaining at the infirmary only temporarily, and that their real residences were here in this city.
“The residence of a pauper at a poor house is the precinct in which the poor house is located.” (Lemoyne v. Farrell, Smith, 406; Stewart v. Kiser, 105 California, 549).
The Legislature, to preserve the secrecy and purity of the ballot, enacted the law known 'as the Australian Ballot Law (R. S., 4536; B. 2966-37) and the law has the following provisions:
“Before leaving the voting shelf the elector shall fold his ballot without displaying the marks thereon, and so as to conceal the same, but show the endorsements and fac simile of the signatures of the proper clerk or board, and keep the same so folded until he has delivered the ballot to the presiding officer. ”
The chief reason for the general adoption of the ballot in this country is that it affords the voter the means of preserving the secrecy of his vote, thus enabling him to vote independently and' freely without being subject to be overawed, intimidated or in any manner controlled by others,'and protect him from any ill will or persecution' on account of his vote. The secret ballot is justly regarded as an important and valuable safeguard for the protection of the voter, and particularly the humble citizen, against the influence which wealth and station may be supposed to exercise. And it is for this reason that the privacy is held not to be limited to the moment of depositing the ballot, but is *465 sacredly guarded by the law for all time unless the voter himself shall voluntarily divulge it. '(McCrary on Elections, Sec. 488.)
This government and its institutions are based upon the will of the people, expressed through the ballot box, and its prosperity will last so long as the ballot of the people is inviolate and the voters have the right of an honest ballot and a fair count, and any violation of that right conferred upon the people should be met with prompt punishment.
“All votes obtained by paying or agreeing to pay money or property or anything of value to electors therefor are to be rejected upon proper proof by the court' or tribunal trying the ease of contest. This rule rests upon principles of great public importance which are thus stated by the Supreme Court of Wisconsin in State v. Olin.
“In our form of government, where the administration of public affairs is regulated by the will of the people, or a majority of them, expressed through the ballot box, the free 'exercise of the elective franchise by the qualified voters is a matter of the highest importance. The safety and perpetuity of our institutions depend upon this. It is therefore particularly important that every voter should be free from any pecuniary influences. For this reason the attempt at bribery to influence an elector in giving his vote or ballot is made an indictable offense by statute.
“The payment or promise of money or other valuable consideration for the giving of a vote no doubt constitutes the offense of bribery or attempt to bribe within the meaning of the statute. Can a vote thus obtained' in direct violation of the statute be considered a valid or legal vote? If it can, then the very object of the statute, which is that it shall not bfe so obtained, is defeated. We are of the opinion that such votes 'are illegal, and that the judge was right in directing the jury to disregard them.” State v. Olin, 23 Wis., 327; Cowan v. Prouse, 93 Ky., 156; McCrary on Elections, Sec. 215). .
‘ ‘ It has never been seriously doubted that a vote obtained by an offer to the voter direct of a pecuniary or other valuable consideration therefor, is a bad vote, and should be rejected.” (McCrary on Elections, Sec. 216; 10 Iowa, 212; 56 Iowa, 397).
“Money paid or promised by a candidate to> a voter for his day or traveling expenses in attending an election or a primary meeting and easting his vote for him, is illegal.” (Howard v. Jacoby, 14 Lanc. Bar, 31.)
*466 So the votes cast by certain men who came from Dayton and Hillsboro and voted 'here on March 30, 1905, their .expenses of transportation being borne by others, are clearly illegal votes. The testimony clearly discloses the fact that their expenses were paid by parties who were working in the interest of the “sale of intoxicating liquors as a beverage.”
It was shown by the testimony of quite a number of the citizens who are legal voters, that they did not vote on March 30, 1905, and the poll books and tally sheets show that 1666 votes were east on March 30, 1905, while at the preceding November election for a national and state ticket, and which naturally called forth a full vote, there was- but 1622 votes cast, thus making a majority in favor of the March election over the November election of 44 votes, which together with the many electors who testified that they did not vote at all on March 30, 1905, gives reasonable grounds for concluding that there were east in this city the votes of many persons who were not legal voters, not being residents of this city on March 30, 1905. These men were interlopers and illegal voters, brought here by those who were working for “the sale of intoxicating liquors as a beverage ’ ’ for the purpose of polluting and corrupting the ballot, by bribery and fraud and overriding the will of the voters and the honest citizens of this municipality.
The use of the carbon ballot outfit in connection with the official ballot is a new device for the purpose of ascertaining how the voter has marked his ballot and it is a new question that has not been passed upon by the courts of this state. It is readily seen if this pernicious practice of corrupting the ballot is permitted to continue, that the fundamental principles of the Australian system of votin¿, and with it the privacy of the ballot, will soon be destroyed.
The inception of the injury and the crime of the use of the carbon envelope and -ballot works four-fold wrongs:
1st. It is open violation of the law.
2d. It divulges the secrecy of the ballot.
3d. It -makes the use of money in elections effective, for it *467 discloses the way of marking the ballot, and offers the proof to the vote purchaser.
4th. It opens the door for the grossest of fraud by the unscrupulous' voter who barters away his right of suffrage for the paltry shekel.
The question arises, are not the votes of the electors who used the carbon outfit illegal? There is but one answer and solution to this question. The use of such a device is for the purpose of determining whether or not the elector who accepts the money voted as he sold himself to do.
It can not be construed in any other light than as a means of corrupting the vote, and is consequently illegal, and, therefore, all voters who used the envelope and carbon ballots are illegal voters.
In determining the number of illegal votes east at the Beal Local Option election held on March 30, 1905, there should be included all votes tainted with the use of money, and votes cast by the carbon ballot users, the non-residents and the minors.
After a careful study of the many persons whose votes were in question, and after giving the benefit of any reasonable doubt in favor of the voter, the court finds that there were sixty-two illegal votes cast at the election held in his city, under the provisions of the Beal Local Option Law on March 30th, 1905, thus leaving a majority against the sale of intoxicating liquors as a beverage of fourteen votes'.
Taking into consideration the vast amount of testimony tending to show the wholesale use of money for the corruption of the ballot and the use of the envelope with carbon sheet and blank ballot on the inside in the hands of many voters, this court is led to the strongest belief that there were other persons who voted in said election who were corrupted, but who were'not detected in the act; also, that there were many places in this city where bargains were made for the purchase of votes and where many voters were afterwards taken and paid for their votes.
This buying and selling of votes was not confined to the upstairs rooms and hallways, and stables and alleys, and the dark places in them, but was carried on in cabs with closed doors. *468 and in some instances with drawn, curtains, in open day light, upon the public streets and in full view of the people.
Mills Gardner, Post & Reid and PL. PL. Sanderson, for the contestants.
Humphrey Jones -and Harper & Harper, for the contestees.
The testimony in this ease showed that this election was strongly impregnated with the odor of corruption, fraud and bribery, and that the side in favor of “the sale of intoxicating liquors as a beverage,” was permeated and honey combed with the vilest of fraud that could be perpetrated upon the sacred rights of the people at the ballot box.
There was no testimony offered on -behalf of contestees to show that the eontestors or their friends had used any money for the purpose of purchasing votes or that they offered inducement of any kind as a corrupting means to influence electors to vote ‘ ‘ against the sale of intoxicating liquors as a beverage. ’
To set this election aside -as fraudulent and void -and order another election in the face of such gross frauds committed by one side only, would not be fair in the face of the majority of' fourteen found by the court in favor of the side “against the sale of intoxicating -liquors as a beverage,” and together with other evidence showing the grossest fraud in the use of the envelope and carbon ballots, bribery ‘and -other inducements and devices resorted to on election day, leads to the reasonable belief that there were a great many more .voters corrupted and bribed than those discovered, and that instead of the majority of fourteen there would have been a much larger majority in favor of the side “against the sale of intoxicating liquors as a beverage,” if the voters had been left to an honest and fair expression of their own free will, without the use o-f bribery -and -other devices to divert and destroy the free and honest expression of their will through the ballot.
It is, therefore, ordered that the proposition “against the sale - of intoxicating liquors as a beverage” is entitled to -and should be accredited with a majority of fourteen votes as a result of said Beal Local Option election -held in the City of Washington on M-areh 30,1905.
The entry to show accordirgly.

 Affirmed by the Common Pleas Court.